# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

In re:                                                    Case No. 11-57408

**SMALL PLATES DETROIT, LLC**                             In Proceedings Under
                                                          Chapter 11
      Debtor
_____/                           Hon. Thomas J. Tucker

### DEBTOR'S FIRST DAY MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH; (B) AUTHORIZING THE DEBTOR TO SELECT A STALKING HORSE BIDDER AND HOLD AN AUCTION, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE BIDDING PROCEDURES AND THE AUCTION, AND (D) GRANTING RELATED RELIEF

Small Plates Detroit, LLC (the "Debtor"), for its First Day Motion for Entry of an Order (a) Approving the Bidding Procedures and Certain Bid Protections in Connection Therewith, (b) Authorizing the Debtor to Select a Stalking Horse Bidder and hold an Auction, (c), Approving the form and manner of Notice of the Bidding Procedures and the Auction, and (d) Granting Related Relief (the "Motion"), states as follows:

#### JURISDICTION

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3. Venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409

## BACKGROUND

### A. The Debtor's Chapter 11 Case

4. On June 23, 2011 (the "Petition Date"), the Debtor filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code.

5. The Debtor is currently operating as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Todd Stern is the responsible person for the debtor-in-possession.

6. No official committee of unsecured creditors holding unsecured claims has been appointed in this case.

7. The Debtor was established in 2001 and operates a fine dining and catering business in Detroit, Michigan.

8. The Department of Economic Growth (the "DEGC") asserts a first priority security interest in the Debtor's assets, and claims to be owed approximately $5,000.

9. JP Morgan Chase Bank, N.A. ("Chase") asserts a second priority security interest in the Debtor's assets, and claims to be owed more than $78,086 plus attorneys' fees.

10. The Internal Revenue Service and the State of Michigan assert third and fourth priority position security interest in the Debtor's assets in amounts of approximately $229,248 and approximately $176,812, respectively.

11. Additionally, the City of Detroit is owed approximately $7,200 for unpaid personal property taxes, which takes a first priority position place ahead of the DEGC pursuant to MCL § 211.40.

B. **Debtor's Efforts to Sell Their Business To Date**

12.  In order to maximize the value of the Debtor's assets, the Debtor has been marketing its assets to third parties for more than one year. *See* Declaration of Todd Stern in Support of Debtor's Chapter 11 Petition and First Day Pleadings (the "Stern Declaration"), which has been filed concurrently with this Motion.

13.  Pursuant to the Debtor's agreement with Chase, the Debtor retained business brokers to assist with the sale of Debtor's business and business assets. Id.

14.  The Debtor initially retained Bieri Company ("Bieri") to be the exclusive broker of the business. Bieri contacted potential investors and listed the business on its website; however, Bieri unilaterally terminated its listing agreement with the Debtor on or about October 29, 2010. Id.

15.  Thereafter, the Debtor engaged Thomas Hospitality Group ("Thomas") to sell the Debtor's business assets, and Thomas's efforts to sell the property included the following: (1) marketing the Debtor's business on the internet and (2) contacting various market participants regarding the availability of the Debtor's assets. Id.

16.  Shortly after entering into the forbearance agreement with Chase, SPDN, LLC tendered a letter of intent to purchase SPD's assets for $150,000 free of liens, claims and encumbrances; however, negotiations with SPDN, LLC to increase the purchase price were unsuccessful and transaction did not proceed. Id.

17.  Notwithstanding the efforts of Bieri Company and Thomas, the Debtor continued to contact potential purchasers and/or investors in the Debtor or its assets. As a result of these efforts and shortly before the termination of the forbearance agreement with Chase, Global Property Advisors ("GPA") offered to purchase the assets of the Debtor for $150,000

provided the assets could be transferred free and clear of the liens, claims and encumbrances. GPA formed Small Plates Detroit, LLC (the "Stalking Horse Bidder"), a Delaware limited liability company, to acquire the Debtor's assets. *See* Stern Declaration.

18. The Debtor review various proposals to complete a sale free and clear of all liens, claims and encumbrances and concluded that the most efficient process was through a sale in bankruptcy. However, the Debtor had insufficient liquidity to pay for bankruptcy services. Id.

19. In order to have the opportunity to purchase the Debtor's assets free and clear of all liens, claims and encumbrances, the Debtor received a $16,000 unsecured loan (the "Loan") from the Purchaser to fund the bankruptcy process. Id.

20. As a result of this Loan, the Stalking Horse Bidder reduced its stalking horse purchase price to approximately $134,000 ("Purchase Price") pursuant to the attached purchase offer, **Exhibit E** (the "Stalking Horse Purchase Agreement"). Id.

21. The Stalking Horse Purchase Agreement is contingent upon several items, including, without limitation, (1) this Court's approval of the sale free and clear of all liens, claims and encumbrances and (2) approval of the transfer of the Debtor's liquor license to the Stalking Horse Bidder by the Michigan Liquor Control Commission. *See* Exhibit E.

D. **The Proposed Bidding Procedures**

22. The Debtor anticipates an auction of substantially all of its assets to be held no later than July 31, 2011 (the "Auction").

23. In order to avoid unnecessary delay in this Small Business Debtor case and provide sufficient notice to all creditors and parties-in-interest of this proposed auction

process, the Debtor hereby requests approval of the following procedures for the Debtor to select a purchaser of its assets and effectuate a sale of those assets:

a. Upon entry of an order granting this Motion, the Debtor may enter into Stalking Horse Asset Purchase Agreement, which will be subject to higher and better offers in accordance with the Bidding Procedures as defined below. The Debtor has contemporaneous with this Motion filed a motion with this Court to approve the sale of the Debtor's assets to the Winning Bidder, as defined below.

b. To obtain the highest and best offer for the Debtor's assets, an auction (the "Auction") will be held to determine the winning bidder (the "Winning Bidder"), and the Debtor proposed certain bidding procedures to govern the submission of competing bids at the Auction, as set forth at **Exhibit B** of this Motion (the "Bidding Procedures").

c. Further and as part of the Bidding Procedures, the Debtor seeks approval of certain customary bid protections, including a break-up fee and overbid protections, for the Stalking Horse Bidder.

24. Debtor has contemporaneously with this Motion, filed is Motion to Sell Assets Pursuant to 11 U.S.C. §363 Free and Clear of Liens, Claims, Interests, and Encumbrances.

### RELIEF REQUESTED

25. By this Motion, the Debtor seeks entry of the order attached hereto as **Exhibit A** (a) approving the Bidding Procedures and certain bid protections in connection therewith; (b) authorizing the Debtor to select the Stalking Horse Bidder as the stalking horse bidder; (c) approving the form and manner of notice of the Bidding Procedures and the Auction; and (d) granting related relief.

BASIS FOR RELIEF

I. **The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Reorganized Debtor's Business.**

26. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A court has the statutory authority to authorize a debtor to use property of the estate under section 363(b) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. *See* Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed under section 363(b)(1)); *see also* Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983).

27. A debtor has the burden, under section 363(b) of the Bankruptcy Code, to establish that it has a valid business purpose for using estate property outside the ordinary course of business. *See* Lionel, 722 F.2d at 1070-1071. Once a debtor has articulated a valid business purpose, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the debtor's best interest. *See* In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D. N.Y. 1992). A party-in-interest must "produce some evidence supporting its objection" when challenging the debtor's valid business purpose. In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (D. Del. 1999).

28. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g.,* Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181

F.3d 527, 535-37 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate); In re Edwards, 228 B.R. 552, [561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); In re After Six, Inc., 154 B.R. 876, 881 (Bankr. E.D. Pa. 1993) (noting that courts should defer to debtor's business judgment with respect to bidding on assets).

29. The paramount goal in any proposed sale of estate property is to maximize the proceeds received by the debtor's estate. *See, e.g.,* In re Food Barn Stores, Inc., 107 F.3d 558, 564-565 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); Integrated Resources, 147 B.R. at 696 ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988).

30. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g.,* In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D. N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); Integrated Resources, Inc., 147 B.R. at 659 (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

31. The Debtor believes that the Bidding Procedures will establish the parameters under which the value of the Debtor's business may be tested at an auction and

{00314413.4}                                                            7

11-57408-pjs    Doc 9    Filed 06/23/11    Entered 06/23/11 14:40:31    Page 7 of 14

ensuing sale hearing. Such procedures will increase the likelihood that the Debtor will receive the greatest possible consideration for its assets because they will ensure a competitive and fair bidding process. The Bidding Procedures also allow the Debtor to undertake the Auction as expeditiously and efficiently as possible, which the Debtor believes is essential to maintaining and maximizing the value of its assets.

32. The Debtor believes that the Bidding Procedures will promote active bidding from seriously interested parties and will dispel any doubts as to the best and highest offer reasonably available at this time for the purchase of the Debtor's assets. Further, the Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close the transaction.

33. The Debtor believes that the Bidding Procedures are consistent with other procedures previously approved by this District, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in Bankruptcy Proceedings. *See* <u>In re Collins & Aikman Corp.</u>, Case. No. 05-55927 (SWR), Docket No. 4177, (Bankr. E.D. Mich., Feb. 21, 2007); <u>In re Oxford Automotive, Inc.</u>, Case No. 04-74377, Docket No. (Bankr. E.D. Mich. Jan. 24, 2005).

## II. <u>The Break-up Fee Is Appropriate under the Circumstances.</u>

34. The Stalking Horse Bidder has requested a break-up fee of $5,000.00 (the "<u>Break-Up Fee</u>").

35. Approval of break-up fees and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. The Debtor submits that the Break-up Fee

and the Initial Minimum Overbid are actual, necessary costs of preserving their estates. *See* O'Brien Envtl. Energy, Inc., 118 F.3d at 535 and 537 (break-up fees examined under general administrative expenses jurisprudence).

36. break-up fees encourage a potential purchaser to invest the time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See. e.g.,* Integrated Resources, Inc., 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a party to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Hupp Indus., 140 BR 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D. N.Y. 1992) (stating that "[a]greements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

37. Courts in the Sixth Circuit considered the following factors in determining the propriety of allowing any reimbursement to an initial bidder:

    a. Whether the amount requested correlates with the maximization of value to the debtor's estate;

    b. Whether the underlying negotiated agreement is an arm's-length transaction between the debtor's estate and the negotiating acquirer;

    c. Whether the principal secured creditors and the official committee of unsecured creditors are supportive of the concession;

    d. Whether the amount constitutes a fair and reasonable percentage of the proposed purchase price;

e.  Whether the amount is so substantial that it provides a "chilling effect" on other potential bidders;

f.  The existence of available safeguards beneficial to the debtor's estate; and

g.  Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*See* Hupp Indus., Inc., 140 B.R. at 194. Here, these factors support the approval of the Break-up Fee.

38. First, the Break-up Fee is designed to induce the Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid on which other bidders may rely. Therefore, the Stalking Horse Bidder will provide a material benefit to the Debtor and its respective creditors by encouraging bidding and increasing the likelihood that the best possible price for the Debtor's assets will be received. *See, e.g.,* Comdisco, Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefits to the Debtor's estate); Integrated Resources, Inc., 147 BR at 659 (noting termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

39. Second, the Stalking Horse Bidder is a third-party arm's length purchaser. The Stalking Horse Bidder initially required substantially greater bid protections than proposed under the Stalking Horse Asset Purchase Agreement. The Debtor negotiated the bid protections to be in-line with what other courts have approved. As a result, it is clear the Break-up Fee was negotiated at arm's-length.

40. Third, the Debtor does not anticipate that the DDA or Chase, its secured lenders, will object to the Break Up Fee because absent a sale of the Debtor's assets, only the DDA will be paid in full because the value of the assets at liquidation is well below the face value of the secured debt, including the secured obligations to the taxing authorities.

{00314413.4}                                         10

11-57408-pjs    Doc 9    Filed 06/23/11    Entered 06/23/11 14:40:31    Page 10 of 14

41.     Fourth, the Break-up Fee in the amount of 3.7% of the purchase price, in percentages relative to the purchase price, is of a similar magnitude to break-up fees and expense reimbursements approved in other chapter 11 cases. *See, e.g.,* In re Collins & Aikman Corp., Case No. 05-55927 (SWR) Docket No. 4532 (Bankr. E.D. Mich. April 19, 2007) (allowing expense reimburse up to a maximum of 4.4%)

42.     Fifth, approval of the Break-up Fee will not have a "chilling effect", rather it will encourage fair and competitive bidding by enabling the Debtor to file and serve notice of a motion to approve the sale of the Debtor's assets to the Stalking Horse Bidder and thereby set a floor on bidding while subjecting the Stalking Horse Bidder's offer to a competitive bidding process at the Auction.

43.     Sixth, there will be minimal impact upon the unsecured creditors in this case, who are expected to be entirely out of the money because the liquidation value of the Debtor's assets is less that the amount due to its secured lender and the taxing authorities, who have liens on its Debtor's assets.

### III.     The Proposed Overbid Protections

44.     One important component of the Bidding Procedures is the requirement of a minimum "overbid" amount to be considered a Qualifying Bid (as that term is defined in the Bidding Procedures). Pursuant to the Bidding Procedures, for a bid to be considered a Qualifying Bid, it must be in a cash amount equal to or in excess of the purchase price in the Stalking Horse Asset Purchase Agreement, plus a $10,000.00 minimum bid increment (such amounts, in the aggregate, the "Initial Minimum Overbid"). The Debtor intends to conduct the Auction such that each bid at the Auction is higher or otherwise better than the previous bid, and the Debtor retains the right to modify the bid increment requirements as appropriate.

Incorporating the concept of overbids in the Bidding Procedures is reasonable under the circumstances and will enable the Debtor to maximize the value for the sale of its assets while limiting any chilling effect on the Auction process. Courts frequently authorize debtors to require a subsequent bidder to include an overbid in the consideration it offers as part of an auction process.

45. The concept of the Initial Minimum Overbid is necessary to ensure that there is an increase in the net proceeds received by the assets, after deducting the Break-up Fee to be paid to the Buyer in the event of a prevailing overbid at the Auction. *See, e.g.,* In re Colony Hill Assocs., 111 F.3d 269, 270 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer by 8.6-percent); Fin'l News Network, 126 B.R. at 154 (requiring minimum overbid of 9.5% in excess of original purchase price); In re Wintex, Inc., 158 B.R. 540, 543 (D. Mass. 1992) (finding a 10% overbid to be a "reasonable litmus test").

### IV. The Proposed Notice, the Bidding Procedures, and the Auction Are Appropriate.

46. The Debtor believes that it will obtain the maximum recovery for its prepetition creditors if the Debtor's assets are sold through a well-advertised Auction. The Debtor already has taken steps to canvass the market and identify the universe of parties that are capable of and potentially interested in acquiring the Debtor's assets. Additionally, the Debtor expects that an Auction may result in a bidding process involving one or more additional interested parties, and may encourage those interested parties already identified to submit additional competing bids.

{00314413.4}                                              12

11-57408-pjs    Doc 9    Filed 06/23/11    Entered 06/23/11 14:40:31    Page 12 of 14

47. Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Debtor's assets, including disclosure of the time and place of any auction. The Debtor requests that notice of the Bidding Procedures Order, and the Auction be deemed adequate and sufficient if:

 a. No later than three business days after entry of the Bidding Procedures Order, the Debtor shall serve by first class mail, postage prepaid, copies of (i) the Bidding Procedures Order, (ii) the Bidding Procedures, and (iii) a notice of auction (the "Auction Notice") substantially in the form of **Exhibit C**. The Auction Notice, together with a copy of the Bidding Procedures Order and the Bidding Procedures, will be served upon the creditor matrix in addition to all parties reasonably known by the Debtor to have an interest or claim against the Debtor's assets (collectively, the "Notice Parties"); and

 b. No later than three business day after entry of the Bidding Procedures Order, the Debtor shall publish a notice (the "Publication Notice"), substantially in the form of **Exhibit D**, in Detroit Legal News.

48. The Debtor submits that the foregoing notice fully complies with Bankruptcy Rule 2002 and is reasonably calculated to provide timely and adequate notice of the Bidding Procedures and the Auction to the Debtor's creditors and other parties-in-interest and also to those who have expressed an interest or are likely to express an interest, in bidding on the Debtor's assets. Based upon the foregoing, the Debtor respectfully requests that this Court approve the notice procedures proposed above.

## CONCLUSION

49. For the foregoing reasons, the Debtor submits that the proposed Bidding Procedures are proper and necessary and reasonably calculated to serve the best interests of the Debtor and its estate. The Debtor reasonably believes that the relief requested in this Motion will maximize recoveries for its creditors. The Bidding Procedures will permit the Debtor to sell its assets in a fair, expedient and prudent manner. Additionally, the Debtor has established that

the Sale of the Debtor's assets at the Auction or pursuant to the Purchase Agreement is in the best interests of the Debtor and its creditor body.

## NOTICE

50. Pursuant to Fed. R. Bankr. P. 2002(a) and 6004(a), notice of this Motion will be given to the creditor matrix and the office of the United States Trustee.

## NO PRIOR REQUEST

51. No previous request for the relief sought herein has been made to this Court or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form attached as **Exhibit A**, (a) approving the Bidding Procedures and certain bid protections in connection therewith, including the Break-Up Fee and I(nitial Minimum Overbid; (b) authorizing the Debtor to hold an Auction and select the Stalking Horse Bidder as the stalking horse bidder; (c) approving the form and manner of notice of the Bidding Procedures and the Auction; and (d) granting related relief.

    Respectfully Submitted:

    SCHAFER AND WEINER, PLLC

By: /s/ John J. Stockdale, Jr.
    JOSEPH K. GREKIN (P52165)
    JOHN J. STOCKDALE, JR. (P71561)
    Attorneys for Debtor
    40950 Woodward Ave., Ste. 100
    Bloomfield Hills, MI 48304
    248-540-3340
    jstockdale@schaferandweiner.com

Dated: June 23, 2011