

EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

Case No. 11-57408

**SMALL PLATES DETROIT, LLC**

In Proceedings Under
Chapter 11

Debtor

_____/

Hon. Thomas J. Tucker

## ORDER GRANTING DEBTOR'S FIRST DAY MOTION FOR ENTRY OF AN ORDER APPROVING THE BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH; (B) AUTHORIZING THE DEBTOR TO SELECT A STALKING HORSE BIDDER AND HOLD AN AUCTION, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE BIDDING PROCEDURES AND THE AUCTION, AND (D) GRANTING RELATED RELIEF

Upon the above-captioned Debtor's First Day Motion for Entry of an Order (a) Approving the Bidding Procedures and Certain Bid Protections in Connection therewith, (b) Authorizing the Debtor to Select the Stalking Horse Bidder as the Stalking Horse Bidder and hold an Auction, (c), Approving the form and manner of Notice of the Bidding Procedures and the Auction, and (d) Granting Related Relief (the "Motion"),[1] all as more fully described in the Motion; and the Court having jurisdiction pursuant to sections 157 and 1334 of title 28 of the United States Code to consider the Motion and the relief requested therein; and venue being proper in this Court pursuant to sections 1408 and 1409 of title 28 of the United States Code; and it appearing that no other or further notice need be provided; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its creditors, and all parties-in-interest; and the Court having heard the evidence and statements of counsel regarding the Motion and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion

{00314952.1}

1

## THE COURT HEREBY FINDS THAT:[2]

A.      The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the auction process, including, without limitation, (i) approval of the Bidding Procedures and, under the circumstances described herein, the Break Up Fee, (ii) authorizing the selection of the Stalking Horse Bidder as the stalking horse bidder and to hold an Auction, and (iii) approval and authorization to serve the Auction Notice.

B.      The Break-up Fee to be paid under the circumstances described herein to the Stalking Horse Bidder is (i) commensurate to the real and substantial benefit that will be conferred upon the Debtor's creditors by the Stalking Horse Bidder; (ii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that may be made, and the efforts that may and must be expended by the Stalking Horse Bidder; and (iv) necessary to induce a Stalking Horse Bidder to come forward, pursue, and be bound by the Stalking Horse Asset Purchase Agreement.

C.      The Break Up Fee also will induce the Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid on which the Debtor, its creditors, and other bidders may rely. The Stalking Horse Bidder will provide a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible price for substantially all of the Debtor's assets will be received. Accordingly, the Bidding Procedures and the Break Up Fee are reasonable, appropriate, and necessary for maximizing value for the benefit of the Debtor's estate.

---

[2] The finding and conclusion set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

D. The Auction Notice and Publication Notice (attached to the Motion as Exhibits C and D, respectively) are reasonably calculated to provide all interested parties with timely and proper notice of the Auction.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The portion of the Motion seeking entry of an Order (a) approving the Bidding Procedures and certain bid protections in connection therewith, including the Break-Up Fee and Initial Minimum Overbid; (b) authorizing the Debtor to hold an Auction and select the Stalking Horse Bidder as the stalking horse bidder; (c) approving the form and manner of notice of the Bidding Procedures and the Auction is granted in its entirety.

2. The Bidding Procedures, substantially in the form of Exhibit B to the Motion, are approved. The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3. The failure to specifically include or reference any particular provision, section, or article of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedure, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

4. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced by the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

5. The Auction Notice and Publication Notice substantially in the form of Exhibit C and D to the Motion, are hereby approved.

6. The Auction Notice, substantially in the form attached as Exhibit C to the Motion, shall be served upon the Notice Parties no later than three (3) business days after entry of this Order.

7. No later than three (3) business days after entry of this Order, the Debtor shall publish the Publication Notice, substantially in the form of Exhibit 3 to the Motion, in the Detroit Legal News and in such other publications as the Debtor and its advisors determine will promote the marketing and sale of the Debtor's assets.

8. As further described in the Bidding Procedures, the Debtor shall conduct the Auction on or before July 31, 2011, if one or more Qualifying Bid (as defined in the Bidding Procedures) is timely received.

9. The Bid Protections are approved and enforceable.

10. The rights of the Stalking Horse Bidder to the Bid Protections shall survive rejection, breach, or termination of the Stalking Horse Asset Purchase Agreement, if later approved by this Court, and shall be unaffected thereby.

11. No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment.

12. Any person wishing to submit an offer or higher or better offer for all or substantially all of the Debtor's assets must do so in accordance with the terms of the Bidding Procedures.

13. The Stalking Horse Bidder shall constitute a Qualified Bidder (as defined in the Bidding Procedures) for all purposes and in all respects with regard to the Auction and the Bidding Procedures.

{00314952.1}                                                        4

14.    The Initial Minimum Overbid is and other overbid protections, as more fully described in the Bidding Procedures, approved and enforceable in accordance with the terms of the Bidding Procedures

15.    The Court shall hold a hearing on the Sale Motion, and said hearing will be held before the Honorable _____, United States Bankruptcy Judge, in courtroom _____, located at 211 West Fort Street, Detroit, Michigan, on August _____, 2011 at _____ _____.m.    All parties seeking to object to this Order must file a written objection which must be received by Debtor's counsel on or before August 1, 2011 at 5:00 p.m. Eastern Standard Time.

16.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.    This Order shall be binding upon and inure to the benefit of the Stalking Horse Bidder and its affiliates, successors and assigns and the Debtors, including any chapter 7 or 11 trustee or other fiduciary appointed for the Debtor's estate, whether in this case, a subsequent bankruptcy case, or upon dismissal of this case or any subsequent bankruptcy case.

18.    The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

19.    The Debtor is authorized and empowered to take such steps, expend such sums of money, and do such other things as may be necessary to implement and effect the terms and requirements established in this Order.

20.    The requirement set forth in Local Rule 9014-1(a) that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

21.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, and 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

22.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.



# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Case No. 11-57408

**SMALL PLATES DETROIT, LLC**          In Proceedings Under
                                                Chapter 11

        Debtor

_____/                Hon. Thomas J. Tucker

## THE BIDDING PROCEDURES

These bidding procedures ("Bidding Procedures") set forth the process by which Small Plates Detroit, LLC (the "Debtor"), as debtor in the pending chapter 11 bankruptcy case in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court"), Case No. 11-57408, is authorized, but not directed, to conduct a sale by auction (the "Auction") of all or substantially all of the Debtor's assets. These Bidding Procedures were approved by Court order dated _____, 2011 [Docket No. ___] (the "Bidding Procedures Order"), pursuant to the Debtor's motion for an order, among other things, (a) approving the bidding procedures and (b) approving the form and manner of the auction notice [Docket No. __] (the "Bidding Procedures Motion"). Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Bidding Procedures Motion. Any party desiring to obtain a copy of the Bidding Procedures Motion may do so by contacting the Debtor's counsel in writing at Schafer and Weiner, PLLC, 40950 Woodward Ave., Ste. 100, Bloomfield Hills, MI 48304, Attn: John Stockdale, Jr.

1. Assets to Be Sold.

        Substantially all of the assets of the Debtor.

2.   Confidentiality Agreements.

Upon execution of a confidentiality agreement, in form and substance satisfactory to the Debtor, any qualified party that wishes to conduct due diligence on the Debtor's assets may be granted access to information that has been or will be provided to each and every bidder subject to these Bidding Procedures.  For a party to be considered a "Qualified Party", such party must demonstrate to the Debtor a reasonable likelihood of an ability to close on a purchase of the Debtor's assets in a timely manner.  The Debtor may, in its discretion and in the exercise of its business judgment, require that such parties demonstrate legitimacy of their interest by, among other things, requiring them to (a) submit a binding letter of intent signed by the company's chief executive officer or other principal and (b) provide proof of access to funds and/or committed capital sufficient to finance the proposed transaction.  Additionally, the "Material Information" to be provided to such Qualified Parties will be information that the Debtor reasonably believes is appropriate in light of the Debtor's need to protect its trade secrets and confidential research, development, and commercial information

3.   Determination of Qualifying Bidder status.

To participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (or group acting together as a bidder) other that the Stalking Horse Bidder must deliver to the Debtor a written offer (each a "Qualifying Bid") so as to be received by no later than the reasonable deadline set by the Debtor, which shall be before the Auction (the "Bid Deadline"), that:

a)   States such Qualifying Bidder offers to purchase;

b)   States such Qualifying Bidder is prepared to enter into a legally binding asset purchase agreement, which is either (i) a mark-up of the Stalking Horse Asset Purchase Agreement or (ii) a mark-up of an asset purchase agreement that the Reorganized Debtor will provide for the acquisition of the Debtor's assets;

c) Be accompanied by a clean and duly executed asset purchase agreement or Stalking Horse Asset Purchase Agreement, as the case may be (the "Modified Purchase Agreement");

d) States such Qualifying Bidder's offer is irrevocable until the closing of the purchase of the Debtor's assets if such Qualifying Bidder is the Winning Bidder or Back-up Bidder (each as defined herein);

e) States such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement;

f) Does not request any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment;

g) Contains such financial and other information that will reasonably allow the Debtor to make a determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, which information is satisfactory to the Debtor, in its discretion, including without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code (to the extent relevant) in a form requested by the Debtor to allow the Debtor to serve on counterparties to any contracts or leases being assumed and assigned in connection with the proposed sale in a timely manner so as to not disrupt the sale process;

h) To the extent relevant, contains such information requested by the Debtor regarding its contracts and unexpired leases, the assignment of which is a condition to closing, which information is satisfactory to the Debtor, in its discretion;

i) Contains information requested by the Debtor regarding the identity of each entity that will be bidding for the Debtor's assets or otherwise participating in connection with such bid, and the complete terms of any such participation, which information is satisfactory to the Debtor;

j) Includes evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Purchase Agreement, which evidence is satisfactory to the Debtor;

k) Is not subject to diligence or a financing contingency;

l) Results in a value to the Debtor, in the Debtor's reasonable judgment after consultation with its legal and financial advisors, in excess of Stalking Horse Bidder's price plus all overbid protections; and

m) Is accompanied by a cash deposit in an amount satisfactory to the Debtor, which shall be no less than $10,000.00, and which required amount may be increased by the Debtor and shall be credited against the Purchase Price.

A competing bid meeting the above requirements, as may be supplemented by the Debtor shall constitute a Qualifying Bid. The Debtor, in its discretion, shall make a determination whether a bid is a Qualifying Bid and shall notify bidders before the Auction whether their bids have been determined to be Qualifying Bids. The Stalking Horse Bidder is deemed a Qualifying Bidder and the Stalking Horse Asset Purchase Agreement constitutes a Qualifying Bid for all purposes.

4.      No Qualifying Bids.

If no Qualifying Bid other than the Stalking Horse Bidder's bid is submitted by the Bid Deadline, the Debtor shall not be required to hold the Auction.

5.      Auction.

In the event that the Debtor timely received a Qualifying Bid in addition to the Stalking Horse Bidder's bid, the Debtor is authorized to conduct an Auction. The Debtor shall determine the date, time and place of the Auction, if any; but in no event shall the Auction commence after July 31, 2011. The Debtor shall send written notice of the date, time and place of the Auction to the Qualifying Bidders no later than two calendar days before such Auction.

The Auction shall be governed by the following procedures:

a) The Auction will be conducted openly and all creditors will be permitted to attend, though only the Qualifying Bidders shall be entitled to: (i) make any subsequent bids at the Auction; (ii) make statements on the record at the Auction; or (iii) otherwise participate at the Auction in any manner whatsoever;

b) Creditors may only attend the Auction if they provide written notice to the Debtor's counsel that is received by the Debtor's counsel no less

than 24 hours before the Auction, at Schafer and Weiner, PLLC, 40950 Woodward Ave., Ste. 100, Bloomfield Hills, Mi 48304; Attn: John Stockdale, Jr.; telephone (248) 540-3340; facsimile (248) 282-2157; E-mail: jstockdale@schaferandweiner.com;

c) Each Qualifying Bidder shall be required to represent that it has not engaged in any collusion with respect to the bidding or the sale, though Qualifying Bidders are permitted to make joint bids;

d) The Qualifying Bidders shall appear in person at the Auction, through a duly authorized representative, or as otherwise agreed;

e) The bidding at the Auction may be transcribe or videotaped, at the Debtor's election;

f) The Auction shall proceed with an initial minimum overbid of $10,000 greater than the price contemplated in the Stalking Horse Asset Purchase Agreement (the "First Price"). If there is no First Price, the Auction shall commence with the highest Qualifying Bid, as determined by the Debtor in its discretion. In either event, the Auction shall continue thereafter at minimum additional increments of $5,000, which may be increased or decreased on the Debtor's sole discretion (the "Overbid Protections").

g) All Qualifying Bidders shall have the right to submit additional bids and make additional modifications to the Modified Purchase Agreement at the Auction, provided that any such modifications, on an aggregate basis and viewed as a whole, shall not be less favorable to the Debtor than such Qualifying Bidders previous bid;

h) The Debtor shall consider, as part of any subsequent bids by the Stalking Horse Bidder, the amount of the Break-up Fee;

i) Any Auction shall continue until the Debtor determines that there is only one offer that is the highest or otherwise best offer from among the Qualifying Bidders submitted at the Auction (the "Winning Bid"), which shall be subject to Court approval; provided that the Purchase Agreement, if any, shall be considered the Winning Bid if there are no other Qualifying Bidders;

j) In selecting the Winning Bid, the Debtor may consider all factors, including, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of each bidder's ability to close a transaction and the timing thereof; the form and substance of the purchase agreement requested by each bidder and the

net benefit to the Debtor's creditors, taking into account the Stalking Horse Bidder's right to the Break-up Fee;

k) The Bidder submitting such Winning Bid shall become the "Winning Bidder," and shall have such rights and responsibilities of the Buyer, as set forth in the applicable Stalking Horse Asset Purchase Agreement or Modified Purchase Agreement, as applicable; and

l) The Debtor may require that within one calendar day after adjourning the Auction, the Winning Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Winning Bid was made; provided that the Debtor may require the Stalking Horse Bidder to execute such documents within three calendar days of the Debtor determining not to have an Auction if there are no other Qualifying Bids.

6.    Sale Hearing.

The Winning Bid will be subject to approval by the Bankruptcy Court. Please be advised that the hearing to approve the sale of the Debtor's assets to the Winning Bidder (or the Stalking Horse Bidder, if no Qualifying Bid other that of the Stalking Horse Bidder is received or accepted) (the "Sale Hearing") will take place on August 3, 2011 or as soon thereafter as may be heard by the Court. The Sale Hearing, if any, may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

7.    Failure to Consummate Purchase by the Winning Bidder.

If an Auction is conducted, the party with the Qualifying Bid (including for this purpose the Stalking Horse Bidder) that is the next highest or otherwise best to the Winning Bid at the Auction, as determined by the Debtor, shall be required to serve as the back-up bidder (the "Back-up Bid" and the "Back-up Bidder," respectively) and keep such bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that this the earlier of (a) 120

days after the date of the Sale Hearing, (b) such date upon which the Debtor will notify the Back-up Bidder, or (c) the closing of the sale transaction with the Winning Bidder.

Following the Sale Hearing, if the Winning Bidder fails to reasonably promptly consummate a sale consistent with the Winning Bid because of a breach or failure to perform on the part of such Winning Bidder, the Back-up Bidder will be deemed the new Winning Bidder, and the Debtor will be authorized, but not required, to consummate a sale with the Back-up Bidder as contemplated by the Back-up Bid without further order of the Bankruptcy Court. In such case, (a) the defaulting Winning Bidder's deposit, if any, shall be forfeited to the Debtor and (b) all parties-in-interest, and the Debtor specifically, reserves the right to seek all available damages from the defaulting Winning Bidder.

Except as otherwise provided herein, all deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder or the Back-up Bidder by no later than the fifth business day following the conclusion of the Auction. The deposit of the Back-up Bidder shall be held by the Debtor until the earliest of 24 hours after (a) 120 days after the date of the Sale Hearing, (b) such date upon which the Debtor will notify the Back-up Bidder, or (c) the closing of the sale transaction with the Winning Bidder.

8. Reservation of Rights; Deadline Extension.

The Debtor reserves its rights, in the exercise of its fiduciary duties, to modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Debtor's assets, including, without limitation, extending the deadlines set forth in the Bidding Procedures, modifying bidding increments, adjourning or canceling the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, withdrawing from the Auction any or all of the Debtor's assets at any time prior to

{00314953.1}                                   7

or during the Auction, or cancelling the sale process or Auction, and rejecting all Qualifying

Bids if, in the Debtor's business judgment, no such bid is for a fair and adequate price.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ John J. Stockdale, Jr.
JOSEPH K. GREKIN (P52165)
JOHN J. STOCKDALE, JR. (P71561)
Attorneys for Debtor
40950 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304
(248) 540-3340
jstockdale@schaferandweiner.com

Dated: June 23, 2011



## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                            Case No. 11-57408

**SMALL PLATES DETROIT, LLC**            In Proceedings Under
                                                  Chapter 11

       Debtor

_____/        Hon. Thomas J. Tucker

### NOTICE OF AUCTION SALE AND BIDDING PROCEDURES

On June 23, 2011, Small Plates Detroit, LLC (the "<u>Debtor</u>") filed its petition for relief under Chapter 11 of the United States Bankruptcy Code.

On June 23, 2011, the Reorganized Debtor filed its *First Day Motion for Entry of an Order (A) Approving the Bidding Procedures and Certain Bid Protections in Connection therewith, (B) Authorizing the Debtor's to Select a Stalking Horse Bidder and Hold and Auction, (C) approving the form and Manner of Notice of the Bidding Procedures and the Auction, and (D) Granting Related Relief* (the "<u>Bidding Procedures Motion</u>"). On July __, 2010, the Court granted the Motion and entered its *Order (A) Approving the Bidding Procedures and Certain Bid Protections in Connection therewith, (B) Authorizing the Debtor's to Select a Stalking Horse Bidder and Hold and Auction, (C) approving the form and Manner of Notice of the Bidding Procedures and the Auction, and (D) Granting Related Relief* (the "<u>Order</u>").

Pursuant to the attached Order and Bidding Procedures, the Debtor's assets will be sold at an auction scheduled for July 29, 2011, at 9:00 a.m. at the offices of Schafer and Weiner, PLLC, 40950 Woodward Ave., Ste. 100, Bloomfield Hills, MI 48304.

Respectfully Submitted:

SCHAFER AND WEINER, PLLC

By: / s / John J. Stockdale
     JOSEPH K. GREKIN (P52165)
     JOHN J. STOCKDALE, JR. (P71561)
     Attorneys for Debtor
     40950 Woodward Ave., Ste. 100
     Bloomfield Hills, MI 48304
     248-540-3340
     jstockdale@schaferandweiner.com

Dated: June __, 2011



# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                                   Case No. 11-57408

**SMALL PLATES DETROIT, LLC**                 In Proceedings Under
                                                         Chapter 11

            Debtor

_____/        Hon. Thomas J. Tucker

## NOTICE OF AUCTION SALE

Please take notice that pursuant to *Order (A) Approving the Bidding Procedures and Certain Bid Protections in Connection therewith, (B) Authorizing the Debtor's to Select a Stalking Horse Bidder and Hold and Auction, (C) approving the form and Manner of Notice of the Bidding Procedures and the Auction, and (D) Granting Related Relief* (the "Order") [Docket No. __] entered by the United States District Court for the Eastern District of Michigan, Small Plates Detroit, LLC (the "Debtor") will be conducting an auction of its assets on July 29, 2011 beginning at 9:00 a.m. at the offices of Schafer and Weiner, PLLC, 40950 Woodward, Ste. 100, Bloomfield Hills, Michigan 48304. The qualifications, procedures, and deadlines in connection with the Auction and all aspects of this sale are governed by the Order and Bidding Procedures approved by the Order. A copy of the Order and Bidding Procedures are available upon request.

Bidders must be qualified by 5:00 p.m. on July 25, 2011, by providing, among other things, a proposed asset purchase agreement indicating the value you intend to bid, together with a deposit in certified funds or by wire transfer in an amount equal to the greater of $10,000. Qualifying Bidders will be notified two calendar days prior to the auction of the date and time of the auction.

The assets of the Debtor will be auctioned as whole. Bidding increments will be in increments of $5,000.00, which may be increased or decreased in the sole discretion of the Debtor.

A party wishing to submit materials in connection with becoming a Qualified Bidder and/or to submit a bid should direct such materials as follows:

        Originally executed materials shall be sent to:

        John Stockdale, Jr., Esq.
        Schafer and Weiner, PLLC
        40950 Woodward Ave., Ste. 100
        Bloomfield Hills, MI 48304

And copies of all such materials shall be sent to the following:

Small Plates Detroit, LLC
1521 Broadway
Detroit, MI 48226

A party requiring further information about the auction process, this notice, wire transfer instructions or other materials information regarding these proceedings should contact John Stockdale, Jr. of Schafer and Weiner, PLLC, 40950 Woodward Ave., Ste. 100, Bloomfield Hills, MI 48304, jstockdale@schaferandweiner.com.

SCHAFER AND WEINER, PLLC

By: / s /John J. Stockdale, Jr.
JOSEPH K. GREKIN (P52165)
JOHN J. STOCKDALE, JR. (P71561)
Counsel for Debtor
40950 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304
jstockdale@schaferandweiner.com

Dated: June __, 2011

<u>**Exhibit E**</u>

**Stalking Horse Purchase Agreement**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into this __th day of June, 2011 (the "Effective Date") by and between **SMALL PLATES DETROIT, LLC,** a Michigan Limited Liability Company, ("SPD" or "Seller"); and **SMALL PLATES DETROIT, LLC,** a Delaware limited liability company, ("Purchaser"). Seller and Purchaser will be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS:

A. Seller now owns and operates a Michigan Liquor Control Commission ("MLCC") Class C licensed bar and restaurant business with License No. Class C 114878-2010, and Sunday Sales, Sunday AM Sales, Food and Outdoor Service Permits (collectively referred to as the "Liquor License"), located at 1521 Broadway Street, Detroit, Michigan 48226 (the "Site") under the business name of "Small Plates" (the "Business").

B. The Parties previously entered into an Option to Purchase the Assets of Seller, which has been extended through June 30, 2011.

C. Purchaser has completed its due diligence review of the Seller's Business.

D. Seller intends to file a Voluntary Petition or Petitions under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court").

E. Seller also intends to seek approval from the Bankruptcy Court to sell substantially all of its assets with the approval of the Bankruptcy Court in accordance with Section 363 of the Bankruptcy Code, which requires that any offer for the purchase of assets be subject to higher and better at an auction sale (the "Auction Sale") either through a sale motion or a plan.

F. The Seller desires to sell its assets to Purchaser, and Purchaser desires to purchase Seller's assets, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the matters recited above and the covenants, representations, warranties and agreements herein contained, and for other good and valuable consideration, the receipt of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

1.   **Sale of the Purchased Assets and Assumption of Liabilities**.

1.1   **Purchased Assets**.  At the Closing (defined below), Purchaser shall buy and Seller shall sell, assign, convey, transfer, set over, and deliver (by appropriate instrument of transfer) to Purchaser, free and clear of any and all liens, claims or encumbrances, all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on the Closing Date are owned by Seller or in which Seller has an interest of any kind (collectively the "Purchased Assets"), which include, without limitation, the assets identified below:

A.  All of the fixed assets, equipment, machinery, tooling and supplies used or held for use by Seller, including those items listed on **Schedule 1.A**;

B.  The intellectual property presently used or that has been used primarily in the Business, including but not limited to, business name(s), business telephone numbers, (including fax numbers), e-mail addresses used by Seller, software used or useful to the Business, websites, domain names, social media accounts, all technology used or useful to the Business, and all patents, know-how, trademarks, service marks, business plans, trade secrets, proprietary information, employee handbook, training guides and manuals.  This includes, but is not limited to, recipes and menus.  This also includes, but is not limited to, the federal service mark registration for the service mark "Small Plates" (Serial Number 76306573);

C.  To the extent transferable, all of Seller's rights under the Assumed Contracts (as defined in section 2.3 of this Agreement), identified on **Schedule 1.C**;

D.  All alcoholic and non-alcoholic beverages, and food products;

E.  All of the prepaid expenses and security deposits that relate to any of the Assumed Contracts;

F.  Customer lists and files of the Business;

G.  To the extent they are transferable, all rights under express or implied warranties from or rights against Seller's suppliers with respect to the Purchased Assets or the Assumed Contracts;

H.  All rights to causes of action, lawsuits, claims and demands of any nature available to Seller;

I.  All of Seller's rights and interests under all outstanding purchase orders entered into by Seller for the purchase of goods or services used in the Business;

J.  All assets to the extent transferable and used in connection with the operation of the Business, all other or additional privileges, rights, interests, properties and assets of Seller of every kind and description and wherever located, that are used or intended

{00314689.2}                                    2

for use in connection with, or that are necessary to the continued conduct of, the Business as was conducted on the date of this Agreement;

K. The leasehold interests of Seller, if any, as lessee of personal property used in or useful to the Business; and

L. All insurance policies and performance bonds, if any, covering the Purchased Assets of the Business and any right or claim arising from such bond or policy, provided Purchaser shall have reasonable access thereto in connection with its conduct of the Business.

1.2    **Liabilities Assumed and Excluded**.  Except as otherwise provided herein, as of the Closing Date, Purchaser shall assume, pay, and perform in due course only the liabilities of Seller under any Assumed Contract (the "<u>Assumed Liabilities</u>").  Purchaser shall not assume or be liable for any other liabilities related to the Purchased Assets other than the expressly and specifically Assumed Liabilities.

2.    **Purchase Price and Payment**.

2.1    **Purchase Price**.  The purchase price of the Purchased Assets shall be $130,000 plus an amount in cash equal to the value of the alcoholic beverages, non-alcoholic beverages, and food products as of the date of Closing (the "<u>Purchase Price</u>").

2.2    **Purchase Price Allocation**:  The parties shall jointly agree to the allocation of the purchase price between tangible and intangible assets; however, Purchaser and Seller shall jointly conduct an inventory prior to Closing and mutually agree on the portion of the Purchase Price to be allocated to the purchase of non-alcoholic beverages and food products. The portion of the Purchase Price allocated to the sale of the alcoholic beverages shall be the wholesale price, as per price from authorized suppliers

2.3    **Deposit.**  The Purchaser has deposited with Schafer and Weiner, PLLC client trust account (the "<u>Escrow Agent</u>") the sum of Ten Thousand and No/100 Dollars ($10,000) as a deposit (the "<u>Deposit</u>") toward the purchase price to be paid by the Purchaser to the Seller on the Closing Date.  In the event that the transactions hereunder shall proceed to Closing, the Deposit shall be paid to the Seller at closing and shall be deemed a credit to the total Purchase Price due by the Purchaser to the Seller under the terms of this Agreement. In the event that Purchaser terminates this agreement pursuant to section 12.1 of this Agreement, the Escrow Agent shall return the Deposit to the Purchaser and this Agreement shall be deemed null and void and neither party shall have any further liability to the other, other than due to a default by either party under this Agreement.  In the event that the Purchaser should terminate this Agreement except as provided

under section 12.1 of this Agreement, the Escrow Agent may release the Deposit to the Seller as liquidated damages pursuant to Section 12.2 of this Agreement.

2.4     **Assumed Contracts**.   Within ten (10) Business Days following the Effective Date this Agreement, the Seller shall provide to the Purchaser true and complete copies of all of Seller's Business Contracts and Leases.   Within ten (10) Business Days following receipt of all such Business Contracts and Leases, Purchaser shall provide to Seller written notice of those Business Contracts and Leases that Purchaser desires to assume from and after the Closing Date ("Assumed Contracts").   In the event that the Purchaser fails to provide any notice of an election to assume any Business Contracts and Leases than it shall be deemed that Purchaser has not elected to assume any of the Business Contracts and Leases.  With respect to any Assumed Contract, Seller shall obtain from the other party to such Assumed Contract (i) a consent to the assignment of such Assumed Contract from the Seller to the Purchaser or (ii) a Bankruptcy Court order authorizing the assumption and assignment of the Assumed Contract by Purchaser.  The Purchaser shall have no liability with respect to any Business Contracts and Leases that are not assumed by Purchaser pursuant to the terms of this Agreement.

2.5     **Payment of Purchase Price**.  On the date of the Closing, Purchaser shall pay the Purchase Price by (a) releasing the Deposit to the Seller, and (b) paying the difference between the Purchase Price and the Deposit to Seller in certified funds.

3.     **"As Is" Condition**.  Purchaser acknowledges and agrees that it has conducted all due diligence and has inspected the Purchased Assets and hereby accepts the Purchased Assets in their "As Is" condition, without any warranties or representations, expressed or implied, including, without limitation, any warranties regarding the condition of the Purchased Assets.

4.     **Closing**.

4.1     **Date and Location of Closing**.  Provided that all of the conditions to closing under sections 10 and 11 of this Agreement have been satisfied and/or waived, the closing shall take place within ten (10) days after all of the contingencies in this Agreement are fulfilled unless extended by the mutual written agreement of the Parties (the "Closing").  The Closing shall take place at the offices of Schafer and Weiner, PLLC, located at 40950 Woodward Ave., Ste. 100, Bloomfield Hills, Michigan 48304, or any other location as mutually agreed upon by the Parties.

5.     **Documents to be Delivered by Seller**.  At the Closing, or prior thereto, the Seller shall execute and deliver to Purchaser:

5.1     A copy of Seller's Certificate of Good Standing with the State of Michigan.

5.2     A copy of the Seller's duly authorized resolutions empowering Seller to enter into the transactions contemplated by this Agreement, attached as Exhibit 5.2.

5.3     Bill of Sale, substantially in the form attached to this Agreement as Exhibit 5.3, and/or other Assignment for the Purchased Assets, and all inventory, including alcoholic beverages.

5.4     An Assignment of the Liquor License.

5.5     Any and all other documents reasonably required to consummate the transactions contemplated by this Agreement.

**6.     Documents to be Delivered by Purchaser**. At the Closing, or prior thereto, the Purchaser shall execute and deliver to Seller:

6.1     A copy of Purchaser's filed Articles of Organization, attached as Exhibit 6.1.

6.2     A copy of the Purchaser's Operating Agreement, attached as Exhibit 6.2.

6.3     A copy of Purchaser's Certificate of Good Standing with the State of Delaware, attached as Exhibit 6.3.

6.4     A copy of the Purchaser's duly authorized resolutions empowering Purchaser to enter into the transactions contemplated by this Agreement, attached as Exhibit 6.4.

6.5     Any and all other documents reasonably required to consummate the transactions contemplated by this Agreement.

**7.     Representations and Warranties of the Seller**.  The Seller hereby represents and warrants to Purchaser as follows:

7.1     **Corporate Status**.  The Seller is a corporation duly organized and authorized to do business in Michigan and is in good standing under the laws of the State of Michigan.

7.2     **Authority and Compliance**.  The Seller has full power and lawful authority to execute and deliver this Agreement and, except as otherwise disclosed to Purchaser, to consummate and perform the transactions contemplated hereby.  This Agreement has been duly authorized, executed and delivered by the Seller, constitutes the legal, valid and binding obligations of the Seller and is enforceable against the Seller in accordance with its terms.

7.3     **Compliance of the Seller**.  Neither the execution and delivery of this Agreement or any of the Seller's related agreements and documents, nor the consummation of by the Seller's of the transactions contemplated hereby or thereby, will conflict with or result in a

{00314689.2}                                          5

breach of any of the terms, conditions or provisions of its by-laws, or any statute or administrative regulation, or any order, writ, injunction or decree of any court or governmental authority.

7.4 **Title**. Seller owns the Purchased Assets and, subject to Bankruptcy Court approval, will convey the Purchased Assets to Purchaser free and clear of any and all liens, claims or encumbrances except as disclosed to Purchaser in writing.

8. **Representations and Warranties of Purchaser**. The Purchaser hereby represents and warrants to Bank as follows:

8.1 **Corporate Status**. The Purchaser is a limited liability company duly organized and authorized to do business in Michigan and is in good standing under the laws of the State of Delaware.

8.2 **Authority and Compliance**. The Purchaser has full power and lawful authority to execute and deliver this Agreement and to consummate and perform the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by the Purchaser, constitutes the legal, valid and binding obligations of the Purchaser and is enforceable against the Purchaser in accordance with its terms.

8.3 **Compliance of the Purchaser**. Neither the execution and delivery of this Agreement or any of the Purchaser's related agreements and documents, nor the consummation of by the Purchaser of the transactions contemplated hereby or thereby, will conflict with or result in a breach of any of the terms, conditions or provisions of its by-laws, or any statute or administrative regulation, or any order, writ, injunction or decree of any court or governmental authority.

8.4 **Operation of Business**. Purchaser shall have operated the Business from the date of this Agreement through the Closing in substantial conformity with the Management Agreement (as defined herein), executed on or about May 27, 2011, and in doing so shall not have violated any applicable statute, rule or administrative regulation, or any order, writ, injunction or decree of any court or governmental authority.

8.5 **Liquor License**.

8.5.1 Within fourteen (14) calendar days following the Effective Date of this Agreement, Purchaser shall apply to the MLCC for a transfer of the Liquor License from Seller to Purchaser.

8.5.2 To the best of Purchaser's knowledge and the knowledge of the person signing this Agreement on behalf of Purchaser, there is nothing in the background of any entity or individual that will be investigated by the MLCC in connection with Purchaser's application to transfer that may prohibit transfer of the Liquor License to Purchaser.

8.5.3    The Purchaser has sufficient liquid funds to satisfy the Purchase Price and the source of such funds is cash on hand.

9.    **Survival of Representations and Warranties**.    All representations and warranties shall expire and terminate on the one (1) year anniversary of the Closing.

10.    **Conditions Precedent to Obligations of Purchaser at Closing**. The obligations of Purchaser to perform this Agreement at the Closing are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Purchaser:

10.1    MLCC Approval.  Purchaser shall have obtained all necessary approvals from the MLCC to transfer the Seller's liquor licenses to Purchaser.

10.2    Bankruptcy Court Approval.  Seller shall have obtained all necessary approvals and orders from the Bankruptcy Court and under federal bankruptcy law which shall, in all respects, authorize (a) the sale and transfer of the Purchased Assets and Assumed Liabilities to the Purchaser, (b) the transaction contemplated by this Agreement, and (c) Seller to pass the Purchased Assets to Purchaser pursuant to section 363 of the Bankruptcy Code free and clear of all liens, claims and encumbrances.

10.3    Accuracy of Representations and Warranties. The representations and warranties of Seller contained in this Agreement and all Related Documents shall be true and correct at and as of the Closing Date as though such representations and warranties were made on the Closing Date. Further, upon request of Purchaser, Seller shall deliver to Purchaser, and Purchaser shall deliver to Seller, a certificate, substantially in the form attached as Exhibit 10.3, certifying that as of the Closing Date all of the representations and warranties of Seller, on the one hand, and Purchaser, on the other hand, contained in this Agreement are true and correct. "Related Documents" means all documents, whose execution is contemplated under this Agreement, including without limitation, those documents referenced as Exhibits or Schedules to this Agreement.

10.4    Performance of Covenants. Unless otherwise agreed or waived, Seller shall have in all respects performed and complied with all covenants, agreements, and conditions that this Agreement and all Related Documents require to be performed or complied with before or on the Closing.

10.5    No Litigation. No action, suit, or other proceeding shall be pending or threatened before any court, governmental authority, or other lawful body seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in connection with this Agreement, or involving a claim that consummation of this Agreement shall be in violation of any law, decree, or regulation.

10.6    No Material Adverse Change. Except as described in this Agreement, there shall have been no material adverse change or development in the Business or the Purchased Assets; and no fact or condition shall exist or be contemplated or threatened

which will, or in Purchaser's reasonable judgment will be likely to, cause such a change or development.

10.7 <u>Lease</u>. Purchaser shall have entered into a new lease for Seller's premises with Seller's landlord satisfactory to Purchaser in its sole discretion.

10.8 <u>Employment Agreement</u>. Purchaser shall have entered into an employment agreement with Todd Stern, including non-compete provisions, with terms satisfactory to Purchaser in its sole discretion.

10.9 <u>Service Mark</u>. Small Plates, LLC, a Michigan limited liability company, shall have conveyed to Seller all Small Plates, LLC's right title and interest in the federal service mark registration for "Small Plates" (Serial Number 76306753).

11. **Conditions Precedent to Obligations of Seller at Closing**. The obligations of Seller to perform this Agreement at the Closing are subject to satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Seller:

11.1 <u>Representations and Warranties</u>. The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing as though made on and as of the date of Closing.

11.2 <u>Performance of Obligations of Purchaser</u>. Purchaser shall have performed all obligations required to be performed by it under this Agreement and any other agreement between the parties, including without limitation, the Management Agreement, prior to the Closing.

11.3 <u>Closing Documentation</u>. Seller shall have received this Agreement, the Related Documents, and all other instruments and documents reasonably required by this Agreement to be delivered by Purchaser to Seller, and such other instruments and documents as Seller shall reasonably request which are not inconsistent with the provisions of this Agreement.

12. **Termination or Breach by Purchaser.**

12.1 **Termination by Purchaser**. It is agreed and understood that in the event that the conditions set forth in Section 10 are not fulfilled within seven months of the date of this Agreement, or upon the non-occurrence of any of the conditions, Purchaser may cancel and terminate this Agreement and obtain a full refund of the deposit.

12.2 **Breach by Purchaser**. If Purchaser fails to consummate the sale after fulfillment of the conditions set forth in Section 10 or if Purchaser shall commit a material breach the Management Agreement, Seller may elect (1) to seek specific performance of this Agreement pursuant to Section 17 hereof, or (2) retain the Deposit in full satisfaction of this Agreement, it being difficult, if not impossible, to ascertain the amount of damages or loss that would be caused to and/or suffered by Seller by a breach of this Agreement The Parties agree that the amount of

liquidated damages stated herein in the event of a breach or default by Purchaser represents a fair and equitable amount of damages in view of the impossibility of ascertaining actual damages.

13. **Post Closing Matters.**

    **13.1 Further Assurances.** From time to time after Closing, the Seller shall execute and deliver to Purchaser upon Purchaser's reasonable request such instruments of sale, transfer, conveyance, assignment and delivery, and other instruments as may be necessary or desirable, among other things, to vest in Purchaser all right, title and interest of the Seller in and to the Purchased Assets.

14. **Entire Agreement and Miscellaneous Provisions.** This Agreement sets forth the entire understanding of the Parties, with respect to the subject matter hereof. Any previous agreements or representations on the subject matter hereof are merged into and superseded by this Agreement. This Agreement may be amended, modified or supplemented only by written instrument duly executed by both Parties. All representations, warranties, covenants, terms and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.

15. **Mutual Drafting.** This Agreement is the joint product of Seller and Purchaser and each provision hereof has been subject to the mutual consultation, negotiation and agreement of Purchaser, on the one hand, and Seller, on the other, and shall not be construed for or against any one Party hereto.

16. **Assignment.** Neither Party to this Agreement may assign this Agreement without the express written consent of the other Party. Notwithstanding the foregoing, Purchaser may assign this Agreement to a special purpose vehicle formed to consummate the transactions contemplated by this Agreement.

17. **Specific Performance; Injunctive Relief.** Each Party acknowledges that the the other Party would suffer irreparable harm and would have no adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms. Accordingly, Each Party is entitled to injunctive relief to prevent or remedy breaches of this Agreement and to enforce specifically the terms and provision of this Agreement, without having to prove the inadequacy of any remedy that may be available at law or being required to post bond or other security.

18. **Governing Law.** This Agreement shall be interpreted and enforced in accordance with the laws and in the State of Michigan, without reference to the principles governing the conflicts of laws applicable in that or any other jurisdiction. The Parties irrevocably consents to the exclusive jurisdiction and venue of any state court within Wayne County, Michigan, or the Bankruptcy Court, if applicable, in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein. Further, each Party agrees that process may be served upon them in any manner authorized by the law of the State of Michigan or under the Bankruptcy Code, if applicable. Each Party waives and covenants not to

assert or plead any objection which they might otherwise have to such jurisdiction, venue and such process.

19.    **Severability**.    Any provision of this Agreement which is finally determined to be invalid or unenforceable in any jurisdiction or under any circumstance shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or rendering unenforceable the remaining provisions hereof in such jurisdiction or under such circumstances.

20.    **No Waiver**.    Waiver or failure of any Party to exercise in any respect any right provided for herein shall not be deemed a waiver of any future right hereunder, nor shall any such waiver by any Party be deemed a continuing waiver. No delay or omission by any Party in exercising any right under this Agreement, at law, or in equity, or otherwise, shall impair any such right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any right preclude other or further exercise thereof.

21.    **Interpretation.**    Article titles and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of any of the provisions of this Agreement. All references to subsections contained in this Agreement refer to the sections and subsections of this Agreement. All references to Exhibits or Schedules contained in this Agreement are references to the Exhibits and Schedules described on the list immediately following the signature page of this Agreement. All pronouns and any variation thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.

22.    **No Third Party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of each Party hereto and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

23.    **Legal Advice, Understanding Terms and Voluntary Execution.** The Seller and the Purchaser each represent and warrant that prior to the execution of this Agreement: (i) they have reviewed the terms and conditions of this Agreement with their respective legal counsel, or had the opportunity to and have been encouraged to do so and declined; (ii) if they have chosen to review this Agreement with legal counsel, counsel has answered to their satisfaction all questions, if any, that they may have had concerning the terms and conditions of this Agreement or the consequences of executing this Agreement; (iii) they understand and agree to the terms and conditions of this Agreement; and (iv) they freely and voluntarily execute this Agreement.

24.    **Notices**.    All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication shall be deemed duly given (a) two (2) Business Days after its is sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) Business Day after it is sent for Business Day delivery via reputable nationwide overnight courier service; or (c) on the date sent after transmission by facsimile with written confirmation, in each case to the intended recipient as set forth below (or at such other address for a Party hereto as shall be specified in writing in a notice given in accordance with this Section).

{00314689.2}                    10

| | |
|---|---|
| **TO THE SELLER:** | SMALL PLATES DETROIT, LLC |
| | 1521 Broadway Street |
| | Detroit, MI 48226 |
| | |
| **WITH A COPY TO:** | John J. Stockdale, Jr., Esq. |
| | SCHAFER & WEINER, PC |
| | 40950 Woodward Ave. |
| | Suite 100 |
| | Bloomfield Hills, MI 48304 |
| | |
| **TO THE PURCHASER:** | SMALL PLATES DETROIT, LLC |
| | Attention: Todd Wenzel |
| | 429 N. Franklin St. |
| | Suite 409 |
| | Syracuse, New York 13204 |
| | |
| **WITH A COPY TO:** | Mark S. Demorest, Esq. |
| | DEMOREST LAW FIRM, PLLC |
| | 322 West Lincoln Avenue |
| | Royal Oak, MI 48067 |

24. **Expenses**. Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each Party will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the transactions contemplated by and under this Agreement.

25. **Public Announcements**. No Party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other Parties; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law, regulation or stock market rule (in which case the disclosing Party shall use reasonable efforts to consult the other Parties and provide them with a copy of the proposed disclosure prior to making the disclosure).

26. **Counterparts and Facsimile Signatures**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document and facsimile copies or signatures shall be treated as originals for all purposes.

27.   **Management Agreement.**   Simultaneous with execution of this Agreement, Seller and Purchaser shall enter into a Management Agreement in the form attached as Exhibit 27 (the "Management Agreement"), for Purchaser to operate the business pending closing.

*IN WITNESS WHEREOF*, the Parties have executed this Agreement as of the day and year first above written.

**SELLER:**

SMALL PLATES DETROIT, LLC
a Michigan limited liability company

By: _____
Its: Member

**PURCHASER:**

SMALL PLATES DETROIT, LLC,
a Delaware limited liability company

By: TODD A. WENZEL
Its: Member

{00314689.2}