UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 11-57408

**SMALL PLATES DETROIT, LLC**                   In Proceedings Under
                                                Chapter 11
                    Debtor
_____/                Hon. Thomas J. Tucker

**DECLARATION OF TODD STERN IN SUPPORT OF
DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

In support of the Debtor's Chapter 11 Petition and First Day Pleadings, I hereby declare the following:

1. I am the Authorized Member of Small Plates Detroit, LLC ("SPD" or "Debtor"), a Michigan limited liability company. I have been in this position since 2006. From 2002 to 2006, I was the manager of SPD's sole restaurant.

2. Except as otherwise stated, I make this Declaration upon personal knowledge, and if called as a witness, could competently testify to the facts contained herein.

3. The Debtor filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on June 23, 2010 (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court").

4. The Debtor continues to operate its business and manage its assets as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[1] I have been informed by counsel that no request has been made for the appointment of a trustee or examiner, and no official committee has been appointed to date by the Office of the United States Trustee.

---

[1] The Bankruptcy Code and section of the Bankruptcy Code are references to Title 11 §§ 101 *et seq.*

{00314024.2}

1

5. In 2008, Small Plates Royal Oak, LLC ("SPRO"), a Michigan limited liability company and SPD's sister company, sought Chapter 11 bankruptcy protection, Case No. 08-62793-pjs.

## THE DEBTOR'S BUSINESS

6. SPD was established in 2001 to own and operate a single location, tapas-style restaurant in Detroit, Michigan. In 2002, SPD opened to the public at its current location. Additionally, SPD provides catering services to variety of individual and corporate clients.

7. SPD's business is highly seasonal. It earns the bulk of its revenues during the opera season.

8. Further, SPD is also dependent on the local economy. As the local economy declined in 2008 and the economy fell into recession, the business of SPD also declined. The local economy has not improved enough that the business of SPD has returned to health.

9. As a result of the economic decline, the Debtor became unable to satisfy its operational costs and service its long-term debt and tax obligations.

10. The majority of the Debtor's value arises from SPD's ongoing operations, and its ability to continue providing high-end dining and catering services to its customers from its current location under the Small Plates name.

## THE SALE PROCESS

11. In 2010, the Debtor and others were sued by JP Morgan Chase Bank, N.A. (the "Bank"), its largest secured lender, in the Circuit Court for Wayne County, State of Michigan, in a case styled *JP Morgan Chase Bank, N.A. v. Small Plates Detroit, LLC, et al.*, Case No. 09-31128-PD, (the "Lawsuit") for nonpayment of its debt obligations. The Lawsuit was consensually resolved and the parties thereto entered into a forbearance agreement.

12. Although I had been seeking additional investors for the Debtor since 2009, the forbearance agreement required the Debtor to list its business with a broker and sell the business in order to satisfy its obligations to the Bank.

13. Shortly after entering into the forbearance agreement with Chase, SPD received an letter of intent from SPDN, LLC to purchase SPD's assets for $150,000 free of liens, claims and encumbrances. Negotiations with SPDN, LLC to increase the purchase price were unsuccessful and transaction did not proceed.

14. Pursuant to the forbearance agreement, the Debtor initially retained Bieri Company ("Bieri") to be the exclusive broker of the business. I was informed by Kees Janeway from Bieri that Bieri's efforts to sell the business included contacting potential investors or purchasers, and listing the business on its website; however, Bieri unilaterally terminated its listing agreement with the Debtor on or about October 29, 2010.

15. Thereafter, SPD engaged Thomas Hospitality Group ("Thomas") to sell SPD's business assets. Michael Schied of Thomas has informed me that his efforts to sell the property included the following: (1) marketing the business on the internet and (2) contacting various market participants regarding the availability of SPD's assets.

16. Notwithstanding the efforts of Bieri Company and Thomas, I continued to contact potential purchasers and/or investors in the Debtor or its assets. As a result of these efforts, Global Property Advisors ("GPA") offered to purchase the assets of the Debtor for $150,000 provided the assets could be transferred free and clear of the liens, claims and encumbrances. GPA formed Small Plates Detroit, LLC, a Delaware limited liability company, to acquire the Debtor's assets.

17. Since the forbearance agreement was scheduled to terminate on May 31, 2011, and the purchase price offer by GPA was adequate to satisfy the Debtor's obligation to the bank, the Debtor agreed to sell its assets to a business entity formed by GPA.

18. The Debtor reviewed various proposals to complete a sale free and clear of all liens, claims and encumbrances and concluded that the most efficient process was through a sale in bankruptcy. However, the Debtor had insufficient liquidity to pay for bankruptcy services.

19. In order to have the opportunity to purchase the Debtor's assets free and clear of all liens, claims and encumbrances, the Debtor received a $16,000 unsecured loan (the "Loan") from the Purchaser. The proceeds of this loan were earmarked for payment of Applicant's pre-petition legal fees and provide a portion of the bankruptcy retainer. The proceeds of the Loan have been distributed.

20. As a result of this Loan, the Purchaser reduced its stalking horse purchase price to approximately $134,000.

21. The Debtor is contemporaneously filing a motion to approved bidding procedures and hold an auction for SPD's assets as well as a motion sell SPD's assets pursuant to section 363 of the Bankruptcy Code free and clear of all liens, claims and encumbrances.

### THE FIRST DAY MOTIONS

22. To minimize the adverse effects of filing the Voluntary Petition on its business, the Debtor has requested various types of "first day" relief (collectively, the "First Day Motions") that is intended to allow the Debtor to maintain its ongoing business operations and fulfill its duties as debtor-in-possession. I make this Declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the Debtor to file the following First Day Motions:

a. Debtor's First Day Motion for Entry of an Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection (the "Cash Collateral Motion"); and

b. Debtor's First Day Motion for Order Authorizing Payment of Pre-petition Wages, Salaries and Employee Benefits (the "Wages Motion");

I believe the relief sought in each of the First Day Motions is (i) necessary for the Debtor to make a successful transition to and operate in chapter 11 with minimal interruption or disruption to its business, and (ii) constitutes a key factor in maximizing and preserving the value of the Debtor's estate.

## DEBTOR'S NEED TO USE OF CASH COLLATERAL

23. Before the Petition Date, the Debtor entered into a business loan agreement, evidenced by a promissory notes, as may have been amended from time to time, (the "DDA Note") in favor of Department of Economic Growth Corporation, as successor to City of Detroit Downtown Development Authority, (the "DDA"). Pursuant to the DDA Note, the Debtor borrowed $100,000.00 from DDA in 2002 for working capital and capital improvements.

24. SPD also entered into a business loan agreement, evidenced by a promissory note, as may have been amended from time to time, (the "Chase Note") in favor the Bank. Pursuant to the Chase Note, the SPD borrowed $308,300 in 2002 from the Bank for working capital.

25. Repayment of the DDA Note and the Chase Note is secured by liens upon all of the Debtor's inventory, chattel paper, accounts, equipment and general intangibles (collectively, the "Collateral"), as more fully described in the loan agreement(s) and other related documents executed by DDA and/or Chase, as applicable, and the Debtor (collectively and together with the DDA Note and the Chase Note, the "Loan Documents"). Additionally, the Internal Revenue Service (the "IRS") and the State of Michigan (the "State") may assert an interest in Debtor's Cash

Collateral. The IRS claims to be owed approximately $229,248.00, and the State claims to be owed approximately $176,812.00. Each has filed a tax lien against the Debtor's accounts.

26. Upon information and belief, DDA claims that approximately $5,000 is currently owed under the DDA Note and the Bank claims that approximately $78,086 (plus attorneys' fees) is owed under the Chase Note.

27. The Debtor requires the use of cash collateral to make such payments as are necessary for the continuation of its business, as shown on Exhibit A (the "Budget").

28. I prepared the Budget, together with SPD's bookkeeper and GPA, who currently manages SPD's restaurant pursuant to a management contract, and the Budget is based on Debtor's historical revenues and expenses and GPA's management experience.

29. The Budget projects the anticipated revenue and expenses of the Debtor and demonstrates the amount of funds that the Debtor must expend on its operations in order to avoid immediate and irreparable harm to the estate. The amount of money that the Debtor will need to avoid immediate and irreparable harm during the term of the Budget (30 days) is $74,562.88.

30. Without the ability to make payments as set forth in the Budget, the Debtor would be unable to ensure the continued operation of its business. A substantial portion of the value of the business as a going concern arises from the ability to timely provide high-end, quality dining and catering services to its many customers.

31. Based on the Budget, the Debtor expects to break even and will thereby be able to provide its secured creditors, such as Bank and DDA, with adequate protection of their interests in the Debtor's cash collateral by providing replacement liens on the cash collateral.

{00314024.2}

6

11-57408-pjs    Doc 10    Filed 06/23/11    Entered 06/23/11 14:41:54    Page 6 of 10

## DEBTOR'S NEED TO PAY PREPETITION EMPLOYEE WAGES

32. In the Wage Motion, the Debtor seeks the authority, but not the obligation, to pay certain prepetition wages, salaries and employee benefits owing to the Debtor's current employees.

33. As of the Petition Date, the Debtor employed approximately 24 employees and contractors (the "Employees"). The Employees' work is critical to the success of the Debtor's continued business operations.

34. Prior to the Petition Date and in the ordinary course of business, the Debtor regularly incurred obligations to the Employees for wages, salaries, and other compensation. The Debtor typically paid these obligations on a bi-weekly basis. The Debtor pays wages of the Employees every other Wednesday for the two weeks ending ten (10) days before that payday. None of the Debtor's Employees have been paid for the stub period immediately preceding the filing of this chapter 11 case. As of the Petition Date, the Debtor incurred various obligations to the Employees for wages, salaries, and other compensation that had been earned but not yet paid in the ordinary course of the Debtor's payroll practices. By the Wages Motion, the Debtor seeks the authority, but not the obligation, to pay all accrued and outstanding prepetition wages, salaries, benefits, and reimbursements to the Employees. The Debtor will limit any pay to any one employee to the limits set forth in § 507 of the Bankruptcy Code for priority wages and benefits for Employees.

35. The Employees possess the institutional knowledge, experience and skills necessary to support the Debtor's estate. Because of the Debtor's need for the continued commitment of its Employees, the Debtor's requested the relief set forth in the Wages Motion to minimize any hardships to the Employees resulting from the commencement of the Debtor's chapter 11 case.

{00314024.2}

7

36. The uninterrupted continuation of the Debtor's business is critically dependent upon a stable work force. Any significant number of Employee departures or deterioration in Employee morale at this time will immediately and substantially adversely impact the Debtor's operations and result in immediate and irreparable harm to the estate and its creditors. There is a real, immediate risk that if the Debtor is not authorized to continue to honor its prepetition Employee obligations in the ordinary course, the Employees would no longer support and maintain the Debtor's operations, which may have a significant and adverse impact on the Debtor's going concern value. Consequently, the Debtor strongly believes that it is essential that it be permitted to pay the Employees their prepetition wages and continue with the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date. For the foregoing reasons, the Debtor submits that the relief requested in the Wages Motion is in the best interest of the Debtor, its estate and its creditors and should be approved.

### DEBTOR'S NEED FOR SHORTENED NOTICE AND IMMEDIATE HEARING ON FIRST DAY MOTIONS

37. The First Day Motions seek various forms of relief which the Debtor requires in order to allow it to continue operations and maintain the going-concern value of the Debtor's business, and prevent irreparable financial harm to Employees and other parties. The relief sought is, therefore, critical to the success of the Debtor's reorganization efforts, and the need to have the First Day Motions heard as soon as practicable outweighs any concerns that expedited hearing on these motions might raise.

38. For the reasons set forth herein, it is necessary that the Debtor obtain an interim hearing as soon as possible in no event later than June 30, 2011, on the First Day Motions (the "First Day Hearing").

{00314024.2}

8

11-57408-pjs    Doc 10    Filed 06/23/11    Entered 06/23/11 14:41:54    Page 8 of 10

39.     I have been informed that a proposed order scheduling a hearing on the First Day Motions is being filed pursuant to Local Rule 9013-1(c).

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the above statements are true and correct.

_____
Todd I. Stern

Dated: June 23, 2011



EXHIBIT A

| | |
|---|---:|
| Sales | $ 74,900.00 |
| | |
| Costs | |
| Food | 16,352.00 |
| Beverage | 7,776.00 |
| Gross Wages | 28,594.00 |
| Sales Tax | 4,494.00 |
| P/R Taxes:FICA | 2,187.44 |
| P/R Taxes:FUTA | 228.75 |
| P/R Taxes:UIA | 1,401.11 |
| DTE Energy | 2,700.00 |
| Telephone/Cable | 470.33 |
| Legal | 5,000.00 |
| Auto | 509.75 |
| Cell Phone | 250.00 |
| Allied Waste | 575.00 |
| Ecolab - Dishwasher | 800.00  Lease and supplies |
| Ice Machince | 132.50 |
| Credit card fees | 2,000.00 |
| Parking | 400.00 |
| Accounting | 500.00 |
| Pest Control | 42.00 |
| City of Detroit | 150.00 |
| | |
| Total Costs | 74,562.88 |
| | |
| Net Profit | $ 337.12 |